## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **SHEILA K. PHILION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 12-CV-584-PJC** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of the** | ) | |
| **Social Security Administration,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Claimant, Sheila K. Philion ("Philion"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits pursuant to the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals.  Philion appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Philion was not disabled.  For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, the current Acting Commissioner of the Social Security Administration, is substituted for Michael J. Astrue as Defendant in this action.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

**Claimant's Background**[2]

Philion was 46 years old at the time of the hearing before the ALJ on March 1, 2011.  (R. 31).  Philion testified that she was 5 feet tall and weighed approximately 235 pounds.  *Id.*  She had a high school education and two years of vocational training in hospitality careers.  (R. 34).

Philion had done factory work, and she testified that she had sustained several work-related injuries to her back and left shoulder that required surgery.  (R. 33, 44-45, 47-48).  Philion testified that she had carpal tunnel surgeries in 2008 and 2009.  (R. 47-49, 51).  After these surgeries, Philion had problems with her hands cramping and falling asleep.  (R. 47, 51).  She was unable to make a tight grip.  (R. 51).  Philion testified that she did not go back to work after her shoulder surgery in 2008, because she was afraid that she would re-injure her shoulder.  (R. 49).

Following her shoulder surgery, Philion had ongoing complaints of pain and numbness in her shoulder.  (R. 51, 54).  She said that her shoulder pain radiated between her shoulder blades and collarbone.  *Id.*  Philion testified that she had pain, stiffness, and tightness in her neck.  (R. 54).  Her neck and nerve pain made it difficult for her to sleep.  (R. 54, 63).  Philion's pain extended into her elbows and hands.  (R. 55).  She had difficulty raising both of her arms and reaching with her left arm.  (R. 51-52).

Philion testified that she experienced a tingling and burning sensation in her low back that traveled down her leg and into her right knee.  (R. 54).  She experienced back spasms while sitting or standing.  *Id.*  The spasms in her back created a shocking sensation when she sat down.

---

[2] The Court does not include any factual discussion of mental impairments of Philion because she did not assert any error relating to the ALJ's finding that her mental impairments were nonsevere.

*Id.*  She had swelling in her left knee that occasionally radiated down to her ankle.  (R. 55).  Her knee occasionally went out from under her.  *Id.*  She sometimes felt as though she were going to fall over when she was standing.  *Id.*  Philion testified that her doctor recommended that she have surgery on her knee and on her back, but she was afraid to have any more surgeries.  (R. 49-50).  Philion was prescribed Neurontin for her nerve pain, and she testified that it caused memory problems.  (R. 40-41).

Regarding her activities of daily living, Philion testified that she was able to cook, take care of her eight-year-old son, drive, and do light house cleaning.  (R. 58-62).  Her daughter did most of the grocery shopping.  (R. 61).  Philion's social activities included visiting with her family and attending church services.  (R. 59, 62-63).  She had difficulty washing her hair and putting on makeup due to the limitations she had in raising her arms.  (R. 51-52).  She had difficulty lifting a gallon of milk, and she could lift only three pounds.  (R. 57-58).  Driving caused her hand to fall asleep.  (R. 51).  She estimated that she had the ability to walk half a block.  (R. 57).  She was able to stand for approximately 15 to 20 minutes before she would need to sit down.  (R. 56).  Philion estimated that she could sit for about 15 to 30 minutes before she would need to stand up.  (R. 56).  She said that her constant need to shift positions kept her from returning to work.  (R. 55).

Following an injury at work, Philion presented to a Minor Emergency Center on February 13, 2003.  (R. 323-24).  She reported that she had pain in her right hip, right leg, and low back.  (R. 323).  She was diagnosed with lumbosacral sprain; lumbosacral neuritis, not otherwise specified; and accident from overexertion.  (R. 323-24).  She was treated with medications and referred to an orthopedist.  (R. 323).

In March 2003, Philion saw Thomas G. Craven, M.D., with Central States Orthopedic Specialists.  (R. 256-60).  Dr. Craven found evidence of disc herniation to the right at the L2-L3 level.  (R. 256).  Dr. Craven believed Philion's upper back pain was probably due to a myofascial strain or myofascial sprain.  *Id.*  He recommended an epidural steroid injection to her right side at L2-L3, physical therapy, and medication.  (R. 256, 259).

On April 15, 2003, Philion was examined by Steven J. Eichert, D.O., for complaints of persistent upper and lower back pain.  (R. 286-87).  On May 28, 2003, Dr. Eichert performed an extra-foraminal endoscopic right L2-L3 diskectomy with microdissection.  (R. 283-85).  Philion continued to see Dr. Eichert in 2003 for persistent back pain, paresthesias in her right thigh, and interscapular pain.  (R. 276-82).  On November 6, 2003, Dr. Eichert stated that the paresthesias in Philion's right thigh would "be unchanged over a long period of time."  (R. 276).  He recommended nonsteroidal anti-inflammatory drugs.  *Id.*

Richard Hastings, D.O., Ph.D., followed Philion in 2003 and 2004 as part of her workers' compensation claim.  (R. 306-21).  Philion complained of pain in her cervical spine, shoulders, elbows, wrists, buttocks, and hips.  (R. 314, 319).  Dr. Hastings recommended an examination by an orthopedic surgeon and additional imaging.  (R. 311, 316, 321).

John B. Vosburgh, M.D., at Tulsa Bone & Joint, treated Philion in 2004.  (R. 271-75). Philion reported that she had persistent pain in her cervical spine, lumbar spine, and upper dorsal spine.  (R. 273-74).  Based on imaging studies, Dr. Vosburgh assessed Philion with degenerative changes in her spine.  (R. 274).  He advised Philion not to participate in any activity that involved bending, stooping, twisting, running, climbing, and lifting over five pounds.  (R. 274).  He recommended physical therapy, vocational training, and weight loss.  (R. 271, 274).

Philion was examined by Randall Hendricks, M.D. with Central States Orthopedics on March 14, 2005, and her weight was 256 pounds. (R. 233-35). Philion had complaints of numbness and tingling in her right leg, pain between her shoulder blades, and pain in her lower back. (R. 233-34). On April 11, 2005 Dr. Hendricks noted spondylotic changes at L2-L3, L3-L4, and L4-L5. (R. 226). Dr. Hendricks recommended that Philion exercise, diet, and lose weight. *Id.* He released Philion to return to work without any restrictions. *Id.*

Steven E. Gaede, M.D., evaluated Philion on March 20, 2007 at the request of the workers' compensation court. (R. 410-14). Dr. Gaede's impressions were persistent cervical pain with interscapular pain that appeared to be discogenic. *Id.* He found kyphosis and angulation at the C4-C5 cervical disc; bilateral radiculitis most consistent with the C5 nerve root; possible shoulder pain; bilateral carpal tunnel syndrome; low back and right leg pain status post-discectomy; and obesity. *Id.* He recommended further diagnostic testing. *Id.*

When Dr. Hastings examined her on July 11, 2007, Philion complained of persistent pain in her neck, shoulders, and upper extremities. (R. 289-305). Her cervical pain was increased by looking up, down, and sideways, and by rotation of her neck. (R. 291). Bending, stooping, lifting, and twisting increased her back pain. *Id.* Dr. Hastings recommended that Philion continue under the care of Dr. Gaede and undergo lumbar discogram testing. (R. 294).

At the referral of Dr. Gaede, Philion was examined by C. Scott Anthony, D.O., with Tulsa Spine & Specialty Hospital on September 10, 2007. (R. 365-70). Dr. Anthony's diagnosis was right-sided L2 radiculopathy. (R. 365). He performed a right-sided L2 transforaminal lumbar epidural steroid injection. *Id.* Philion received additional steroid injections in 2007, 2008, and 2009. (R. 333-60).

5

On March 19, 2008, Dr. Gaede performed a right carpal tunnel release.  (R. 393, 421-23).

Dr. Gaede's operative report diagnoses were right carpal tunnel syndrome; cervical spondylosis;

lumbar radicular pain; obesity; and clinical left carpal tunnel without electrical confirmation.  (R.

421).  At Philion's surgical follow-up appointment on April 23, 2008, he recommended that

Philion be referred to an orthopedic shoulder expert for evaluation and treatment.  (R. 393-95).

On August 25, 2008, Brian Chalkin, D.O., at Orthopedic Center diagnosed Philion with a

left shoulder full thickness tear of the supraspinatus and early acromioclavicular joint arthritis.

(R. 439).  On October 2, 2008, Dr. Chalkin performed a left shoulder arthroscopic rotator cuff

repair and subacromial decompression.  (R. 438-39).

Dr. Gaede saw Philion on December 11, 2008, and made a report to the judge in the

workers' compensation matter.  (R. 380-81).  He said that Philion was eligible for "light duties

with a lifting restriction of 20 pounds occasionally during the day and no repetitive bending,

stooping, twisting, crawling or climbing."  (R. 380).

On March 5, 2009, Philion told Dr. Gaede that she had pain in her right thigh and had

difficulty standing.  (R. 375).  Dr. Gaede advised Philion that she had the option to "either make

a settlement," or consider a laminotomy and foraminotomy to possibly improve her pain.  *Id.*

Philion underwent a left carpal tunnel release by Dr. Chalkin on May 12, 2009.  (R. 447-

48).  On July 24, 2009, Dr. Chalkin released Philion to work without any restriction.  (R. 469).

R. Tyler Boone, M.D., evaluated Philion for ongoing complaints of back pain in

September and October 2009.  (R. 475-76).  On October 21, 2009, Dr. Boone advised Philion

that she needed to diet, lose weight, and exercise.  (R. 512).  He assessed that she had reached

maximum medical improvement, and he released her from his care.  (R. 513).  Dr. Boone stated

that Philion needed permanent restrictions of maximum lifting of 40 pounds and repetitive lifting of 20 pounds.  *Id.*  She was to avoid repetitive bending, stooping, and overhead activities.  *Id.*

Dr. Hastings submitted an amended report dated December 17, 2009 in Philion's workers' compensation case.  (R. 571-90).  Dr. Hastings concluded that Philion was "100% permanently totally disabled."  (R. 590).

On January 5, 2010, Philion was examined by Bruce Smith, a rehabilitation consultant. (R. 554-65).  Smith determined that Philion would not be a candidate for retraining due to her low test scores and academic skills.  (R. 559).  He found that she was not employable in jobs in significant numbers due to her inability to perform a full range of sedentary functions.  (R. 559-60).  He concluded that Philion was permanently and totally disabled due to her injury in February 2003.  (R. 560).

On January 14, 2010, Stephen J. Kabrick, P.T., C.A.E., performed a general functional capacity evaluation.  (R. 591-95).  Philion reported high pain levels.  *Id.*  Kabrick stated that Philion "did poorly" with the lifting and carrying portion of the test.  (R. 592).  Kabrick wrote that Philion was "[n]ot consistent with her effort.  She was able to lift 10 pounds, but was not able to hold and carry a 2.5 pound milk case."  *Id.*  Philion was unable to bend forward, crawl, and kneel.  (R. 591).  Kabrick found that Philion had a less than sedentary physical demand level. *Id.*

Agency examining consultant Corey R. Babb, D.O., conducted a physical consultative examination of Philion on December 14, 2009.  (R. 533-38).  Dr. Babb recorded that Philion was 5' 2" tall and weighed 248 pounds.  (R. 534).  On examination, Philion had decreased range of motion in her shoulders and spine due to her pain.  *Id.*  She had muscle spasms along her

paraspinal gutters bilaterally.  *Id.*  She had neck pain with palpation.  *Id.*  Dr. Babb's assessments were chronic back pain, chronic neck pain, and muscle spasms.  *Id.*

Nonexamining agency medical consultant, Walter W. Bell, M.D., completed a Physical Residual Functional Capacity Assessment on January 12, 2010.  (R. 596-603).  Dr. Bell indicated that Philion could occasionally lift or carry up to 20 pounds and frequently lift or carry up to 10 pounds.  (R. 597)*.*  He found that Philion could stand and/or walk for a total of about 6 hours in an 8-hour workday and could sit for a total of 6 hours in an 8-hour workday.  *Id.*  For narrative explanation, Dr. Bell noted Philion's 2003 work injury and her October 2008 last day of work.  (R. 597).  He noted that Dr. Gaede had given permanent restrictions in December 2008 of lifting 20 pounds occasionally and no repetitive bending, stooping, twisting, crawling, or climbing.  *Id.*  Dr. Bell then recounted Philion's treating history, including her multiple surgeries.  (R. 598).  Dr. Bell briefly summarized the consultative report of Dr. Babb and Philion's activities of daily living.  *Id.*  For postural limitations, Dr. Bell found that Philion could never climb ladders, could only occasionally stoop, crouch, or crawl, and could frequently climb stairs, balance, and kneel.  *Id.*  For manipulative limitations, Dr. Bell found that Philion had no restrictions on her right side, but was limited to no overhead reaching on her left side.  (R. 599).  Dr. Bell found no visual, communicative, or environmental limitations were established.  (R. 599-600).

### Procedural History

Philion filed an application on September 17, 2009, seeking disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq*.  (R. 145-46).  Philion alleged onset of disability as October 14, 2008.  (R. 145).  The application was denied initially and on reconsideration.  (R. 77-81, 86-88).  A hearing before ALJ John W. Belcher was held March 1, 2011 in Tulsa, Oklahoma.  (R. 27-69).  By decision dated March 18, 2011, the ALJ found that

Philion was not disabled.  (R. 11-23).  On August 15, 2012, the Appeals Council denied review

of the ALJ's findings.  (R. 1-6).  Thus, the decision of the ALJ represents the Commissioner's

final decision for purposes of this appeal.  20 C.F.R. § 404.981.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A).   A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy."  42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim.  20 C.F.R. § 404.1520.[3]  *See also Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988)

(detailing steps).  "If a determination can be made at any of the steps that a claimant is or is not

disabled, evaluation under a subsequent step is not necessary."  *Id.*

---

[3] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510.  Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).  If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings").  A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182, 1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied.  *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion.  *Id.*  The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'"  *Id., quoting Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner.  *Hamlin,* 365 F.3d at 1214 (quotation omitted).

### Decision of the Administrative Law Judge

The ALJ found that Philion met insured status requirements through December 31, 2013. (R. 13).  At Step One, the ALJ found that Philion had not engaged in any substantial gainful activity since her asserted onset date of October 14, 2008.  *Id.*  At Step Two, the ALJ found that Philion had severe impairments of "lumbar spine status post; degenerative disc disease, cervical spine, left shoulder status post, bilateral carpal tunnel syndrome, left knee medial meniscus tear, and left ankle."  *Id.*  At Step Three, the ALJ found that Philion's impairments did not meet a Listing.  (R. 14).

The ALJ determined that Philion had the RFC to perform less than sedentary work.  (R. 14-15).  The AJC specified that:

> [Philion] must have a sit/stand option every hour.  She has the ability to
> occasionally climb stairs, balance, bend or stoop, kneel, crouch and crawl, never
> reaching above her head with her left arm.

*Id.* At Step Four, the ALJ found that Philion was not able to perform any past relevant work.  (R. 21-22).  At Step Five, the ALJ found that there were significant numbers of jobs in the national economy that Philion could perform, taking into account her age, education, work experience, and RFC.  (R. 22).  Therefore, the ALJ found that Philion was not disabled from October 14, 2008 through the date of his decision.  (R. 23).

**Review**

Philion asserts two points in requesting that the Court reverse and remand this case.  First, she argues that the ALJ erred by failing to explicitly consider her obesity in determining whether she was disabled.  Second, she states that the ALJ erred in his failure to discuss the opinion evidence of Kabrick, a physical therapist who completed a functional capacity evaluation.  Regarding the issues raised by Philion, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with legal requirements.  Therefore, the ALJ's decision is affirmed.

**The Issue of Obesity**

Philion argues that the ALJ failed to list obesity as a separate severe impairment at Step Two and failed to take it into consideration throughout his decision.  Plaintiff's Opening Brief, Dkt. #20, pp. 6-8.  As Philion notes, however, the ALJ at the outset of the hearing asked her height and weight, and she testified that she was 5 feet tall and weighed 235 pounds.  (R. 31).  Additionally, Philion notes that the ALJ included in his detailed discussion of the medical evidence several references to Philion's treating physicians stating that she needed to lose weight.  Plaintiff's Opening Brief, Dkt. #20, p. 7.  Philion states that the ALJ's decision was "silent as to whether or not the ALJ considered the effect of" her obesity.  *Id.* at 8.

The Court finds that the ALJ explicitly considered Philion's obesity, even though he did not list obesity as a separate severe impairment at Step Two.  The references that Philion notes reflect that the ALJ was aware that Philion was obese and that several of Philion's physicians had recommended that she should exercise, diet, and lose weight.  *Doyal v. Barnhart*, 331 F.3d 758, 761 (10th Cir. 2003) ("the form of words should not obscure the substance of what the ALJ actually did").  Further, the ALJ noted that his RFC determination was supported by the findings of the nonexamining consultants.  (R. 21).  Agency nonexamining consultant Dr. Bell explicitly noted that Philion had a body mass index of 45 based on the measurements Dr. Babb included in his consultative examination report.  (R. 598).  Dr. Bell said that "[e]xam findings" were considered in his RFC conclusions.  *Id.*  The opinion of Dr. Bell, which explicitly noted Philion's obesity, was substantial evidence that the ALJ was entitled to rely upon.  *See Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007).

Moreover, other than stating her height and weight, Philion gave no testimony regarding the effect of her weight on her ability to perform physical activities.  (R. 27-69).  Her attorney asked her no questions relating to her obesity.  (R. 44-63).  *See Briggs v. Astrue*, 221 Fed. Appx. 767, 770-71, 837-38 (10th Cir. 2007) (unpublished) (declining to find error in ALJ's discussion of claimant's obesity when claimant "did not address his obesity either in his application for benefits or at the hearing before the ALJ").  *See also Alvey v. Colvin*, 2013 WL 4529410 *3 (10th Cir.) (unpublished) (harmless error when ALJ failed to explain why his RFC included no mental limitations from nonsevere mental impairments given that evidence did "not support assessing any functional limitations from mental impairments"); *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1173 (10th Cir. 2012) (ALJ's failure to mention alleged side effect was harmless error given circumstances of case).

Under the circumstances of this case, the ALJ's discussion of Philion's obesity was adequate.

**Kabrick's Functional Capacity Evaluation**

The Social Security Administration explained how ALJs should consider opinions from medical sources who are not "acceptable medical sources," such as Kabrick, a physical therapist, in Social Security Ruling 06-03p, 2006 WL 2329939.  Generally, the ALJ should discuss and consider opinions from other sources and explain the weight given to these opinions in his decision in enough detail to allow for subsequent review.  *Id*. at 6.

The Court finds that the ALJ's decision was adequate, even though he did not explicitly discuss Kabrick's report.  *Keyes-Zachary,* 695 F.3d at 1166 ("The more comprehensive the ALJ's explanation, the easier our task; but we cannot insist on technical perfection.").  In *Keyes-Zachary*, the Tenth Circuit rejected an argument that the ALJ had not sufficiently discussed treating physician opinion evidence:

> In sum, we reject [claimant's] contention that the ALJ's opinion does not adequately evaluate and discuss the medical-source evidence.  Where, as here, we can follow the adjudicator's reasoning in conducting our review, and can determine that correct legal standards have been applied, merely technical omissions in the ALJ's reasoning do not dictate reversal.

*Id.  See also Zumwalt v. Astrue*, 220 Fed. Appx. 770, 780 (10th Cir. 2007) (unpublished) (LPC was not an acceptable medical source, and ALJ's treatment of her evidence was sufficient).

Here, the ALJ discussed all of the medical evidence, absent Kabrick's report, in some detail.  (R. 15-21).  He then explained that he gave little weight to the opinion of Dr. Hastings that Philion was permanently totally disabled and to the opinion of Smith, the rehabilitation consultant, basing this weight on the difference between workers' compensation law and Social

Security disability law.  (R. 20).  Philion has not appealed from this portion of the ALJ's decision.

In the administrative transcript, the report of Kabrick was placed immediately after the December 17, 2009 Amended Report of Dr. Hastings, and the two, combined, were considered as Exhibit 15F.  (R. 569-95).  When stating that he gave little weight to the opinions of Dr. Hastings and Smith, the ALJ cited to Exhibit 13F, 14F, and 15F.  (R. 20).  The Court finds, therefore, that the ALJ intended to include the report of Kabrick in his analysis of the opinion evidence that was directly related to Philion's workers' compensation claim.  In the introduction to his report, Kabrick said that his evaluation followed guidelines of the Oklahoma Workers' Compensation Court.  (R. 591).  Giving Kabrick's report little weight because it was intended for use in the workers' compensation proceedings was a legitimate reason.  *See, e.g., Seever v. Barnhart*, 188 Fed. Appx. 747, 753 (10th Cir. 2006) (unpublished); *Jones v. Barnhart*, 53 Fed. Appx. 45, 47 (10th Cir. 2002) (unpublished).

Second, Kabrick's report was generally consistent with the RFC assessed by the ALJ. Kabrick concluded that Philion's "physical demand level would be Less than Sedentary."  (R. 591).  The ALJ also concluded that Philion could perform only a limited range of work at the sedentary exertional level.  (R. 14-15).  Portions of Kabrick's report reflect that Philion was limited in her ability to stand and to sit.  (R. 591-95).  The ALJ accommodated this limitation, as least in part, by including a sit/stand option in his RFC determination.  (R. 14-15).  Another of Kabrick's findings was that Philion could not climb stairs, bend forward, crawl, kneel, or squat. The ALJ addressed this concern in his RFC determination, although to a lesser degree, by limiting Philion to doing most postural activities only occasionally.  (R. 14-15).

When evidence does not conflict with the ALJ's RFC determination, the ALJ has a reduced burden for "express analysis." *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004). In *Howard*, the Tenth Circuit rejected the claimant's argument that the ALJ had not complied with his obligation to discuss the evidence. The court first found that the ALJ's discussion was adequate, but then, as a second point, found that "perhaps more importantly, in this case none of the record medical evidence conflicts with the ALJ's conclusion that claimant can perform light work. When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened." *Id.* Here, because the ALJ's RFC determination was consistent with most of the findings in Kabrick's report, the need for the ALJ to discuss the report was reduced.

Finally, the ALJ relied on substantial evidence in determining Philion's RFC. He said he gave "great weight" to the opinions of Dr. Anthony and Dr. Boone, whom he found to be treating physicians. (R. 20). The ALJ also noted that his RFC determination was supported by the findings of the nonexamining consultants. (R. 21). The opinions of those consultants were substantial evidence that the ALJ was entitled to rely upon. *See Flaherty*, 515 F.3d at 1071 (nonexamining consultant's opinion was an acceptable medical source which the ALJ was entitled to consider and which supported his RFC determination).

The ALJ's treatment of the report of Kabrick was adequate, and his RFC determination was supported by substantial evidence.

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED**.

Dated this 15th day of November 2013.

Paul J. Cleary
United States Magistrate Judge